UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK M. McMILLAN,<br><br>    Plaintiff,<br><br>    v.<br><br>O. DELGADO, et.al.,<br><br>    Defendants. | Case No.: 1:19-cv-00444-NONE-SAB (PC)<br><br>FINDINGS AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMNET<br><br>(ECF No. 41) |

Plaintiff Patrick M. McMillan is appearing pro se in this civil rights action pursuant to 42 U.S.C. § 1983. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

Currently before the Court is Defendants' motion for summary judgment, filed on March 8, 2021.

**I.**

**RELEVANT BACKGROUND**

This action is proceeding is proceeding against Defendants O. Delgado, N. Romero, D. Brown, C. Riley, B. Jones, M. Negrete, and J. Dunnahoe, for excessive force in violation of the Eighth Amendment and negligence under California law.

On July 1, 2019, Defendants filed an answer to the complaint.

1

After an unsuccessful settlement conference, the Court issued the discovery and scheduling order on September 11, 2019.

On February 12, 2020, the Court granted Plaintiff's motion to amend the complaint to add a negligence claim, and Plaintiff's first amended complaint was filed this same day.

On March 2, 2020, Defendants filed an amended answer to Plaintiff's first amended complaint.

After extending the discovery and dispositive motions deadlines three times, Defendants filed the instant motion for summary judgment, on March 8, 2021.  Plaintiff has not filed an opposition and the time to do so has now passed.[1]  Local Rule 230(l).

## II.

## LEGAL STANDARD

**A.   Summary Judgment Standard**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984

---

[1] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion pursuant to Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 41-1.)

2

(9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d at 942 (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III.

## DISCUSSION

### A.     Summary of Plaintiff's Allegations in First Amended Complaint

On March 25, 2018, Plaintiff was housed at California Correctional Institution (CCI), Facility A. On this date, all Defendants were posted at CCI and responded to a Code-3 on Facility A, due to a riot involving "Two-Five" gang members. All Defendants responded to the Code-3 alarm. Plaintiff was on the yard as a bystander when the riot erupted on Facility A.

Defendants discharged dozens of rounds, cumulatively from their 40mm less than lethal riot control weapons. Plaintiff was struck twice by 40mm projectiles, once in the face and once in the bicep. Plaintiff was transported to a local area hospital for injuries resulting from being struck and severely injured by the 40mm projective fired from the weapons only Defendants possessed. Plaintiff suffered fractured facial bones and lacerations caused by being shot in the face.

Plaintiff was found not guilty of a Rules Violent Report based upon the preponderance of the evidence.

On October 13, 2018, Plaintiff submitted his complaint to the California Superior Court of Kern County, where CCI is located. Plaintiff exhausted his administrative remedies.

///

///

**B.   Statement of Undisputed Facts[2,3]**

1. Plaintiff is a state prisoner in the custody of the California Department of Corrections and Rehabilitation (CDCR) and was housed at CCI.  (First Am. Compl. (FAC) 2, ECF No. 32.)

2. Defendants Delgado, Romero, Brown, Riley, Jones, Negrete, and Dunnahoe worked as correctional officers at CCI.  (FAC 2.)

Prison Riot on March 25, 2018

3. On March 25, 2018, a prison riot erupted on Facility A yard at CCI, during which many "Two-Five" gang members attacked other inmates with weapons and violence.  (FAC 3, Barthelmes Decl. ¶ 4, ECF No. 44.)

4. A "Code 3" was announced via institutional radio, which is announced when an event occurs of such magnitude that it requires all available custody staff throughout the institution to respond.  (Barthelmes Decl. ¶¶ 5-6; Dunnahoe Decl. ¶ 3; Brown Decl. ¶ 3; Delgado Decl. ¶ 3; Jones Decl. ¶ 3; Romero Decl. ¶ 3; Riley Decl. ¶ 3, ECF Nos. 41-5 to 41:10, ECF No. 44.)

5. During the riot, Defendants yelled multiple orders for inmates to "Get down!" on the ground and to assume a prone position.  (Barthelmes Decl. ¶ 8; Negrete ¶ 5, Dunnahoe Decl. ¶ 5; Brown Decl. ¶¶ 5, 11; Delgado Decl. ¶¶ 5, 12, 15, 24; Jones Decl. ¶¶ 4-5, 7, 9-10; Romero Decl. ¶¶ 4-5, 7-9, 11; Riley Decl. ¶¶ 4, 11; Pl. Dep. 20:25-21:10, 21:20-22:3, ECF Nos. 41-4 to 41:10, ECF No. 44.)

6. All inmates and staff members are trained to know and understand what these orders mean.  (Barthelmes Decl. ¶ 8.)

7. Non-involved inmates moved away from the rioting inmates and assumed prone

---

[2] Plaintiff neither admitted or denied the facts set forth by Defendants as undisputed nor filed a separate statement of disputed facts.  Local Rule 56-260(b).  Therefore, the Court was left to compile the summary of undisputed facts from Defendants' statement of undisputed facts and Plaintiff's verified complaint.  A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).  Because Plaintiff neither submitted his own statement of disputed facts nor addressed Defendants' statement of undisputed facts, the Court accepts Defendants' version of the undisputed facts where Plaintiff's verified complaint is not contradictory.

[3] Hereinafter referred to as "UF."

4

1  positions. (Barthelmes Decl. ¶ 9.)

2        8.      However, many inmates ignored the orders and continued fighting. (Barthelmes Decl.

3  ¶ 9; Negrete Decl. ¶¶ 5-7, 9, 14-22; Dunnahoe Decl. ¶¶ 6-12; Brown Decl. ¶¶ 6-12; Delgado Decl. ¶¶

4  5-8, 10-12, 15, 17-24; Jones Decl. ¶¶ 5, 7, 9-10; Romero Decl. ¶¶ 4-12; Riley Decl. ¶¶ 4-10, ECF Nos.

5  41-4 to 41:10, ECF No. 44.)

6        9.      Responding staff used multiple force options to separate the inmates, subdue the rioting

7  inmates, prevent further injury, and regain control over the yard. (Barthelmes Decl. ¶ 10.)

8        10.     The force options used included CN pocket grenades (which produce smoke); OC blast

9  grenades (that produce pepper spray smoke); MK9 OC pepper spray foggers (which spray pepper

10  spray); "6325 exact impact" sponge rounds (foam-tipped projectiles) fired from 40 mm launchers; and

11  eventually .223 caliber rounds fired from a Ruger Mini 14 rifle. (Barthelmes Decl. ¶ 10; Negrete

12  Decl. ¶¶ 6, 9, 11, 13, 15, 17-21, 23; Dunnahoe Decl. ¶¶ 6, 8-12; Brown Decl. ¶¶ 6-10, 12, 14; Delgado

13  Decl. ¶¶ 5-8, 10-13, 15-16, 18-20, 24; Jones Decl. ¶¶ 5, 7, 9, 10; Romero Decl. ¶¶ 5-8, 10-12; Riley

14  Decl. ¶¶ 5-10, 12, ECF Nos. 41-4 to 41:10, ECF No. 44.)

15        11.     The launchers fire a high-speed projectile with a 40 mm diameter sponge (foam) tip.

16  (Barthelmes Decl. ¶ 12.) The round is a "point-of-aim, point-of-impact" direct fire round that is

17  commonly used by tactical teams and for riot control. (Id.) Officers are trained to target the large

18  muscle groups of the buttocks, thigh, and legs, known as "green zone" or "zone 1," to cause sufficient

19  pain stimulus, while greatly reducing serious or life-threatening injuries. (Id.) The launchers used by

20  correctional officers are most commonly the single shot variant, which requires reloading after each

21  round is fired, and the multi-launcher, which uses a cylinder that holds six rounds, but still needs to be

22  cycled and chambered after each round is fired. (Id.)

23        12.     Plaintiff responded to the orders to assume a prone position by running toward a stair

24  area. (Pl. Dep. 22:2-23:9.)

25        13.     The riot was chaotic and dangerous. (Pl. Dep. 29:23-30:9.)

26        14.     It was appropriate for the custody staff to use force and quell the riot, and specifically,

27  to use the 40 mm launchers. (Pl. Dep. 31:18-20, 32:23-33:1.)

28        15.     Plaintiff was not watching the Defendants fire their 40 mm launchers during the riot,

could not have seen them due to the smoke, and cannot identify who fired the launchers, other than from the written reports.  (Pl. Dep. 37:4-38:5.)

16. Plaintiff does not contend and does not know if the Defendants acted maliciously.  (Pl. Dep. 37:25-38:10.)

17. Plaintiff contends that he was struck by two 40 mm rounds, first to his upper right arm, and second to his zygomatic bone on the right side of his face.  (Pl. Dep. 45:10-13, 49:15-50:2; FAC 3.)

18. Plaintiff does not know who fired the two 40 mm rounds that struck him.  (Pl. Dep. 48:22-49:7, 50:24-51:1.)

19. After Plaintiff was struck the second time, he complied with the orders to assume a prone position to the ground.  (Pl. Dep. 51:2-5.)

20. Nonetheless, the riot continued to go on around Plaintiff.  (Pl. Dep. 53:19-25.)

21. It was not until lethal force was later used on another inmate that all of the rioting inmates complied with the orders to assume a prone position.  (Barthelemes ¶¶ 17-18; Pl. Dep. 54:1-55:3.)

22. A restraint sweep was then initiated on the yard.  (Barthelmes ¶¶ 20-21; Dunnahoe Decl. ¶ 14; Brown Decl. ¶ 15; Delgado Decl. ¶ 25; Riley Decl. ¶ 15.)

23. The inmates were then escorted off the yard.  (Barthelmes ¶ 21; Negrete Decl. ¶ 25; Dunnahoe Decl. ¶ 14; Delgado Decl. ¶ 25; Riley Decl. ¶ 15.)

24. After the yard was cleared, investigating officers discovered multiple items used by the rioting inmates as weapons.  (Barthelmes ¶ 22.)  This included a white sock containing two bars of soap; a brown wooden cane; and three inmate-manufactured slicing/stabbing weapons.  (Id.)  Numerous pieces of bloody clothing were also located, including gloves, beanies, and a white towel.  (Id.)

Defendant Negrete's Involvement

25. Negrete was positioned in the observation tower overlooking the yard.  (Negrete Decl. ¶ 2.)

26. Negrete aimed and fired his first four 40 mm rounds at inmates who were non-

6

compliant with the orders to assume a prone position, were actively fighting other inmates, and whom he believed posed an immediate threat. (Negrete Decl. ¶¶ 9, 11, 13, 15.)

27. Negrete observed a Hispanic inmate making a slashing motion toward a Black inmate. (Negrete Decl. ¶¶ 16-18.)

28. Negrete transitioned from his 40 mm launcher to his Ruger Mini 14 rifle and fired two warning shots near the two fighting inmates. (Negrete Decl. ¶¶ 17-18.)

29. After the warning shots, Negrete transitioned back to his 40 mm launcher, and then aimed and fired his sixth round at a Hispanic inmate who was fighting a Black inmate. (Negrete Decl. ¶¶ 19-20.)

30. Negrete observed a Black inmate swinging a cane at a Hispanic inmate's head, transitioned back to his Ruger Mini 14, and fired a lethal shot at the Black inmate's leg, striking him. (Negrete Decl. ¶¶ 22-23.)

31. At no time was Negrete's view of the riot obstructed. (Negrete Decl. ¶ 28.)

32. Although Negrete could not identify the inmates during the incident, he was able to observe the fight, orient his attention to the fighting inmates and those presenting an immediate threat, assess whether use of force and what level of force was necessary in the moment, and then act on that assessment. (Negrete Decl. ¶ 29.)

Defendant Dunnahoe's Involvement

33. Dunnahoe was positioned in the skirmish line overlooking the yard. (Dunnahoe Decl. ¶ 3.)

34. Dunnahoe aimed and fired his 40 mm launcher at inmates who were non-compliant with the orders to assume a prone position, were actively fighting other inmates, and whom he believed posed an immediate threat. (Dunnahoe Decl. ¶¶ 6-12.)

35. Although Dunnahoe could not identify the inmates during the incident, or see where some of the rounds struck, his view of the fighting inmates was not obstructed at the time he fired his shots. (Dunnahoe Decl. ¶ 16.)

36. Dunnahoe was able to observe the fights, orient his attention to the fighting inmates and

1  those presenting an immediate threat, assess whether use of force and what level of force was
2  necessary in the moment, and then act on that assessment. (Dunnahoe Decl. ¶ 17.)

3  <u>Defendant Brown's Involvement</u>

4  37. Brown was positioned in the skirmish line. (Brown Decl. ¶ 3.)

5  38. Brown aimed and fired his 40 mm launcher at inmates who were non-compliant with
6  the orders to assume a prone position, were actively fighting other inmates, and whom he believed
7  posed an immediate threat. (Brown Decl. ¶¶ 5-14.)

8  39. Although Brown could not identify the inmates during the incident, or see where some
9  of the rounds struck, his view of the fighting inmates was not obstructed at the time he fired his shots.
10  (Brown Decl. ¶ 17.)

11  40. Brown was able to observe the fights, orient his attention to the fighting inmates and
12  those presenting an immediate threat, assess whether use of force and what level of force was
13  necessary in the moment, and then act on that assessment. (Brown Decl. ¶ 18.)

14  <u>Defendant Delgado's Involvement</u>

15  41. Delgado was positioned in the skirmish line. (Delgado Decl. ¶ 3.)

16  42. Throughout the riot, Delgado yelled multiple orders for inmates to "Get down!" in a
17  prone position. (Delgado Decl. ¶¶ 5, 13, 15, 24.)

18  43. Delgado aimed and fired his 40 mm launcher at inmates who were non-compliant with
19  the orders to assume a prone position, were actively fighting other inmates, and whom he believed
20  posed an immediate threat. (Delgado Decl. ¶¶ 5-8, 10-13, 15-20, 23-24.)

21  44. Although Delgado could not identify the inmates during the incident, or see where
22  some of the rounds struck, his view of the fighting inmates was not obstructed at the time he fired his
23  shots. (Delgado Decl. ¶ 27.)

24  45. Delgado was able to observe the fights, orient his attention to the fighting inmates and
25  those presenting an immediate threat, assess whether use of force and what level of force was
26  necessary in the moment, and then act on that assessment. (Delgado Decl. ¶ 28.)

27  <u>Defendant Jones's Involvement</u>

28  46. Jones was positioned in the skirmish line. (Jones Decl. ¶ 3.)

47. Jones aimed and fired his 40 mm launcher at inmates who were non-compliant with the orders to assume a prone position, were actively fighting other inmates, and whom he believed posed an immediate threat. (Jones Decl. ¶¶ 5, 7, 9, 10.)

48. Although Jones could not identify the inmates during the incident, or see where some of the rounds struck, his view of the fighting inmates was not obstructed at the time he fired his shots. (Jones Decl. ¶ 14.)

49. Jones was able to observe the fights, orient his attention to the fighting inmates and those presenting an immediate threat, assess whether use of force and what level of force was necessary in the moment, and then act on that assessment. (Jones Decl. ¶ 15.)

Defendant Romero's Involvement

50. Romero was positioned in the skirmish line. (Romero Decl. ¶ 4.)

51. Throughout the riot, Romero yelled multiple orders for inmates to "Get down!" in a prone position. (Romero Decl. ¶¶ 4-5, 7-9, 11.)

52. Romero aimed and fired his 40 mm launcher at inmates who were non-compliant with the orders to assume a prone position, were actively fighting other inmates, and whom he believed posed an immediate threat. (Romero Decl. ¶¶ 5-12.)

53. Although Romero could not identify the inmates during the incident, or see where some of the rounds struck, his view of the fighting inmates was not obstructed at the time he fired his shots. (Romero Decl. ¶ 14.)

54. Romero was able to observe the fights, orient his attention to the fighting inmates and those presenting an immediate threat, assess whether use of force and what level of force was necessary in the moment, and then act on that assessment. (Romero Decl. ¶ 15.)

Defendant Riley's Involvement

55. Riley was positioned in the skirmish line. (Riley Decl. ¶ 3.)

56. Riley aimed and fired his 40 mm launcher at inmates who were non-compliant with the orders to assume a prone position, were actively fighting other inmates, and whom he believed posed an immediate threat. (Riley Decl. ¶¶ 4-13.)

57. Although Riley could not identify the inmates during the incident, or see where

some of the rounds struck, his view of the fighting inmates was not obstructed at the time he fired his shots. (Riley Decl. ¶ 16.)

58. Riley was able to observe the fights, orient his attention to the fighting inmates and those presenting an immediate threat, assess whether use of force and what level of force was necessary in the moment, and then act on that assessment. (Riley Decl. ¶ 16.)

### C. Analysis of Defendants' Motion

Defendants argue they are entitled to summary judgment because Plaintiff cannot prove that any particular Defendant fired a 40 mm round that struck him and caused his injuries. In addition, the undisputed facts demonstrate that Defendants did not use excessive force during the riot. In the alternative, Defendants argue they are entitled to qualified immunity. Lastly, Defendants argue they are entitled to summary judgment on Plaintiff's negligence claim because the undisputed evidence shows that they acted reasonably during the riot.

1. Video of Incident

Defendants lodged a DVD video recording which contains two recordings taken of the incident on March 25, 2018. (ECF No. 43.) The existence of the video does not change the usual rules of summary judgment: in general, the Court will draw all reasonable inferences from the video in Plaintiff's favor. Blankenhorn v. City of Orange, 485 F.3d 463, 468 n. 1 (9th Cir. 2007). However, if the video "blatantly contradict[s]" a party's account, "so that no reasonable jury could believe it," the court need not credit the contradicted version on summary judgment. Scott v. Harris, 550 U.S. 372, 380 (2007); Williams v. Las Vegas Metro. Police Dep't, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) (The existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor.); Vos v. City of Newport Beach, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light most favorable to the nonmovants ... so long as their version of the facts is not blatantly contradicted by the video evidence."). The Court will consider the video, but will consider the facts in the light most favorable to Plaintiff.

///

///

2. <u>Excessive Force in Violation of the Eighth Amendment</u>

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in [<u>Whitley v. Albers</u>, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992). To determine whether the force used was excessive, courts consider factors such as the need for the application of force, the relationship between the need and amount of force that was used, and the extent of injury inflicted. <u>Whitley</u>, 475 U.S. at 321. "Equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them, and any efforts made to temper the severity of a forceful response." <u>Id.</u>

"Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979); <u>Whitley</u>, 475 U.S. at 321-22. Courts must be hesitant "to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." <u>Whitley</u>, 475 U.S. at 320.

Although the Ninth Circuit has " 'held on many occasions' " that " '[b]ecause the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, ...summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." <u>Glenn v. Washington County</u>, 673 F.3d 864, 871 (9th Cir. 2011) (alterations omitted) (quoting <u>Smith v. City of Hemet</u>, 394 F.3d 689, 701 (9th Cir. 2005) (en banc)); <u>see also</u> <u>C.V. by and through Villegas v. City of Anaheim</u>, 823 F.3d 1252, 1255 (9th Cir. 2016) ("[S]ummary judgment should be granted sparingly in excessive force cases.").

However, "[w]hen opposing parties tell different stores, one of which is blatantly contradicted by [a video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380, (2007). Here, Defendants have submitted two separate video recording of the incident at the CCI. <u>See</u>

11

1  Vos v. City of Newport Beach, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light
2  most favorable to the nonmovants... so long as their version of the facts is not blatantly contradicted by
3  the video evidence.").

4      It is undisputed that on March 25, 2018, a prison riot erupted on Facility A yard at CCI, during
5  which many "Two-Five" gang members attacked other inmates with weapons and violence. (UF 3. )
6  A "Code 3" was announced via institutional radio, which is announced when an event occurs of such
7  magnitude that it requires all available custody staff throughout the institution to respond. (UF 4.)
8  During the riot, Defendants yelled multiple orders for inmates to "Get down!" on the ground and to
9  assume a prone position. (UF 5.) All inmates and staff members are trained to know and understand
10 what these orders mean. (UF 6.) Non-involved inmates moved away from the rioting inmates and
11 assumed prone positions. (UF 7) However, many inmates ignored the orders and continued fighting.
12 (UF 8.) Responding staff used multiple force options to separate the inmates, subdue the rioting
13 inmates, prevent further injury, and regain control over the yard. (UF 9.) The force options used
14 included CN pocket grenades (which produce smoke); OC blast grenades (that produce pepper spray
15 smoke); MK9 OC pepper spray foggers (which spray pepper spray); "6325 exact impact" sponge
16 rounds (foam-tipped projectiles) fired from 40 mm launchers; and eventually .223 caliber rounds fired
17 from a Ruger Mini 14 rifle. (UF 10.) The launchers fire a high-speed projectile with a 40 mm
18 diameter sponge (foam) tip. (UF 11.) Plaintiff responded to the orders to assume a prone position by
19 running toward a stair area. (UF 12.)

20     Thus, the undisputed facts demonstrate that it was appropriate for Defendants to use force to
21 quell the riot, and specifically, to use 40 mm launchers. (UF 14.) Plaintiff was not watching as
22 Defendants fired their launchers, and he could not have seen them due to the grenade smoke on the
23 yard. (UF 15.) Indeed, it is undisputed that Plaintiff does not know who fired the two 40 mm rounds
24 that struck him, and he has presented no evidence to show that any particular Defendant caused his
25 injuries. (UF 18.)

26     Furthermore, the Hudson factors support the finding that summary judgment should be entered
27 in favor of Defendants.
28 ///

### a. The need for the application of force

Here, because a riot erupted at CCI's Facility A yard on March 25, 2018, there was an emergency situation necessitating the use of force to restore discipline and prevent injury to inmates. (UF 3.) During the riot, Defendants yelled multiple orders for inmates to "Get down!" on the ground and to assume a prone position. (UF 5.) However, many inmates ignored the orders and continued fighting. (UF 8.) In addition, the riot was chaotic and dangerous. (UF 13.) Thus, the need for the use of force was obvious. See LeMaire v. Maas, 12 F.3d 1444, 1458 (9th Cir. 1993) ("[P]rison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners from such violent behavior" when inmates become disruptive."); see also Glass v. Scribner, No. 1:04-cv-05953-AWI-DLB, 2009 WL 2579657, at *5 (E.D. Cal. Aug. 19, 2009) ("Insubordination is a matter taken very seriously within the confines of an institutional setting.") Indeed, Plaintiff admits that the use of force was appropriate to quell the riot. (UF 14.)

### b. The relationship between the need for a forceful response and the amount of force used

Here, there was a direct relationship between the escalating need for the use of force and the amount of force used. After the riot erupted, many inmates ignored orders to "Get down!" and continued to fight. (UF 8.) Responding staff used multiple force options to separate the inmates, subdue the rioting inmates, prevent further injury, and regain control over the yard, including CN pocket grenades (which produce smoke); OC blast grenades (that produce pepper spray smoke); MK9 OC pepper spray foggers (which spray pepper spray); "6325 exact impact" sponge rounds (foam-tipped projectiles) fired from 40 mm launchers; and eventually .223 caliber rounds fired from a Ruger Mini 14 rifle. (UF 9, 10.) It is undisputed that it was appropriate for Defendants to use force to quell the riot, and specifically, to use 40 mm launchers. (UF 14.) Indeed, even after Defendants' utilized their 40 mm launchers the fighting did not stop until potentially legal force was directed against another inmate. (UF 21.) Thus, this factor weighs in favor of Defendants.

///

///

### c. Extent of the injury

"Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." Wilkins v. Gaddy, 559 U.S. 34, 38 (2010). Plaintiff's first amended complaint, made under the penalty of perjury, establishes that he was struck once in the face and once in the bicep by a 40 mm launcher, and suffered fractured facial bones and lacerations on his face. In Whitley, the Court found that the extent of physical injury is not the controlling factor in determining whether an Eighth Amendment violation occurred. Whitley, 475 U.S. at 321; see also Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (while the extent of an inmate's injury is relevant to the Eighth Amendment inquiry, "[i]njury and force ... are only imperfectly correlated, and it is the latter that ultimately counts."). In Hudson, the Court held that "[i]n determining whether the use of force was wanton and unnecessary it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by responsible officials," and "any efforts made to temper the severity of a forceful response." Hudson, 503 U.S. at 7. It is undisputed that Plaintiff was shot once in the face and once in the bicep with a 40 mm launcher and suffered injury. The law is clear, however, that injury is but one factor to consider.

### d. The threat reasonably perceived by Defendants

Defendants responded to a "Code 3" alarm announced on the institutional radio, which is done when an event occurs that requires all available custody staff throughout the institution to respond. (UF 4.) Defendants responded and yelled multiple orders for inmates to "Get down!" on the ground and to assume a prone position. (UF 5.) However, many inmates ignored the orders and continued fighting. (UF 8.) Responding staff used multiple force options to separate the inmates, subdue the rioting inmates, prevent further injury, and regain control over the yard. (UF 9.) The force options used included CN pocket grenades (which produce smoke); OC blast grenades (that produce pepper spray smoke); MK9 OC pepper spray foggers (which spray pepper spray); "6325 exact impact" sponge rounds (foam-tipped projectiles) fired from 40 mm launchers; and eventually .223 caliber rounds fired from a Ruger Mini 14 rifle. (UF 10.) The launchers fire a high-speed projectile with a 40 mm diameter sponge (foam) tip. (UF 11.)

A review of the video recording of the riot on March 25, 2018 further demonstrates that the threats to institutional safety and security were immediate and serious. Each Defendant observed several inmates engaged in the active riot and were not complying with orders to assume a prone position. (UF 26, 34, 43, 47, 52, 56.) Defendant Negrete also observed an inmate making a slashing motion toward another inmate. (UF 27.) Negrete also observed an inmate swinging a cane at another inmate's head. (UF 30.) In the first video, several inmates can be seen fighting on a basketball court in the midst waves of grenade smoke and pepper spray. (Stanley Decl. DVD beginning at timestamp 13:34:16.) Multiple groups of inmates are attacking one another, and two different inmates can be seen swinging canes. (Id. at 13:34:32-50.) There is also a four-on-one fight and another inmates swinging a cane. (Id. at 13:35:20, 13:35:33.) In the second video, several inmates can be observed continuing to fight the basketball court amidst a wave of grenade smoke and pepper spray. (Id. beginning at timestamp 13:33:00.) The second video further depicts large groups of inmates fighting one another as officers fire their launchers in attempt to stop the riot. (Stanley Decl. DVD.); see Hudson, 503 U.S. at 6; see also Silverman v. Mendiburu, No. 17-01146 BLF (PR), 2018 WL 2215844, at *4 (N.D. Cal. May 10, 2018) (finding there exists no genuine dispute of material fact as to whether any deputies applied excessive force after reviewing video footage of the hallway showing Plaintiff being "firmly" escorted into his cell by deputies), aff'd and remanded, 785 F. App'x 460 (9th Cir. 2019); Gaddy v. Solis, No. C 11-5568 PJH (PR), 2013 WL 5202590, at *1, *4 (N.D. Cal. Sept. 16, 2013) (relying entirely on Defendants' video evidence in a similar Section 1983 case brought by a state prisoner when granting summary judgment because the "videos entirely support[ed] defendants' factual assertions and contradict[ed] plaintiff's complaint and opposition to summary judgment"), aff'd 588 F. App'x 564 (9th Cir. 2014).

Given the ongoing riot, any reasonable prison official would perceive that the incident posed a danger to inmates and staff and force was necessary to stop it.

### e. Efforts made to temper the severity of a forceful response

Defendants responded immediately to the riot and made several verbal orders for the rioting inmates to "Get down!" to no avail. (UF 5, 8.) Multiple force options were utilized throughout the riot, including smoke and pepper spray to no avail. (UF 9, 10, Stanley Decl. DVD.) The riot did not

1  stop until three .223 rounds (potentially lethal force) was fired and the inmates assumed prone
2  positions. (Id.) Thus, it is undisputed that Defendants used only the force that was necessary to stop
3  the riot.
4        In sum, the Hudson factors, on balance, weigh in favor of summary judgment for Defendants.
5  Although Plaintiff testified that there was no reason to shoot in the area where he retreated (Pl. Dep. at
6  31), there is no evidence to establish that any Defendant maliciously and sadistically fired the 40 mm
7  launcher for the very purpose of causing him harm. In order for an Eighth Amendment excessive
8  force case to survive summary judgment, the evidence must go "beyond a mere dispute over the
9  reasonableness of a particular use of force or the existence of arguably superior alternatives" to
10 support "a reliable inference of wantonness in the infliction of pain." Whitley, 475 U.S. at 322. The
11 fact that Plaintiff was not involved the riot does not change the Court's analysis. Even accepting
12 Plaintiff's allegations—that he was not near or involved in the riot, and that he was shot twice and
13 sustained an injury as a result of shots-Plaintiff has still failed to establish that defendant fired any of
14 the 40mm launcher rounds at him maliciously and sadistically for the very purpose of causing harm.
15 See, e.g., Jeffers v. Gomez, 267 F.3d 895, 902-03 (9th Cir. 2001) (although the plaintiff was
16 mistakenly shot during a riot, the court concluded officers had taken the shots in a good faith effort to
17 restore order because it was undisputed that there was a disturbance in the prison, and there was no
18 evidence suggesting the officers had any evil motive.); Clement v. Gomez, 298 F.3d 898, 903 (9th Cir.
19 2002). It is undisputed that Defendants fired rounds from the 40mm launcher because the inmates
20 continued to fight, and it was not until potentially lethal force was used on another non-party inmate,
21 that all of the rioting inmates finally complied with the orders to assume and a prone position and the
22 riot stopped. (UF 21.) The Court finds that an inference can "be drawn as to whether the use of force
23 could plausibly have been thought necessary." Whitley, 475 U.S. at 320–21, 324 (finding the
24 intentional shooting of an inmate was part of a good faith effort to restore prison security and did not
25 violate the inmate's Eighth Amendment rights). Thus, the Court finds that, given the circumstances,
26 Defendants' use of force was a good faith attempt at restoring order. See, e.g., Hardge v. Alameida,
27 No. 1:05-cv-00718-LJO-DLB PC, 2010 WL 2555755, at *3–4 (E.D. Cal. June 21, 2010) (granting
28 summary judgment in favor of the defendant in an observation tower above fighting inmates who fired

a rubber bullet at the fighting inmates, but unintentionally hit a compliant non-fighting inmate); see also Wallace v. Tull, No. CV 09-5075-VAP-AGR, 2011 WL 1832717, at *5 (C.D. Cal. Mar. 14, 2011) (no genuine issue of material fact despite fact that inmate was struck in the head with 40 mm gun); Forest v. Prine, 620 F.3d 739, 746 (7th Cir. 2010) (the mere fact that a taser hit the inmate's face did not create a genuine issue of material fact). Accordingly, based on the evidence presented does not show a genuine dispute as to any material fact relating to Plaintiff's claim of excessive force against Defendants.

        3.        Negligence Claim

Under California law "[t]he elements of a negligence cause of action are: (1) a legal duty to use due care; (2) a breach of that duty; (3) the breach was the proximate or legal cause of the resulting injury; and (4) actual loss or damage resulting from the breach of the duty of care." Brown v. Ransweiler, 171 Cal.App.4th 516, 534 (2009); accord Mendoza v. City of Los Angeles, 66 Cal.App.4th 1333, 1339 (1998). California law establishes a special relationship exists between a prisoner and a correctional officer giving rise to a duty of care to protect the prisoner from foreseeable harm inflicted by another person. Giraldo v. Dep't of Corr. & Rehabilitation, 168 Cal. App. 4th 231, 246-53, 85 Cal. Rptr. 3d 371, 382 (2008). A correctional officer also may be held liable in negligence for the excessive use of force on an inmate. See Hayes v. County of San Diego, 57 Cal. 4th 622, 628–29, 160 Cal. Rptr. 3d 684, 305 P.3d 252 (2013) (citing California Government Code sections 815.2, 820). It is a "long-established principle of California negligence law that the reasonableness of a peace officer's conduct must be determined in light of the totality of the circumstances." Hayes v. County of San Diego, 57 Cal.4th at 632 (citations omitted). "A police officer's use of deadline force is reasonable if the officer has probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer or others." Brown v. Ransweiler, 171 Cal.App.4th 516, 528 (2009).

Here, the undisputed facts demonstrate that given the totality of the circumstances reflect that Defendants acted reasonably in responding and using force during the riot. It is undisputed that on March 25, 2018, a riot erupted in which multiple inmates were ignored orders to assume a prone position and were violently fighting one another. It is also undisputed that officers responded by

initially using smoke grenades, pepper spray grenades, and pepper spray itself to no avail. It is further undisputed that Defendants' use of the 40 mm launcher proved ineffective in stopping the riot and restoring order, and it was not until potential lethal force was used a non-party inmate that the riot finally stopped. Therefore, based on the undisputed evidence, Defendants acted reasonably under California law to restore order and to keep other staff and inmates safe. See, e.g., Brown v. Ransweiler, 171 Cal.App.4th at 534 (finding officer's use of deadly force reasonable and not negligent when a bystander was struck by bullet); Lopez v. City of Los Angeles, 196 Cal.App.4th 675, 682 (2011) (court granted nonsuit where there was no substantial evidence of unreasonable use of deadly force where officers shot and killed the infant daughter of an armed suspect who was firing at the officers while holding the child); Arrendell v. Perez, No. D065719, 2015 WL 5461502, at *4-6 (finding correctional officer not negligent where she missed her target and shot an innocent bystander inmate because she was reasonably trying to stop the other inmates from fighting).[4]

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment be granted; and
2. Judgment be entered in favor of Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the

///
///
///

---

[4] This Court "may consider unpublished state decisions." Employers Ins. Of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 29, 2021**

UNITED STATES MAGISTRATE JUDGE